UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TYWAN OSBORNE, | ) | Case No. 1:09CV2893 |
| | ) | |
| Petitioner, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| ROBERT WELCH, Warden, | ) | |
| | ) | |
| Respondent. | ) | **Report and Recommendation** |
| | ) | **of Magistrate Judge** |
| | ) | |
| | ) | |

Petitioner Tywan Osborne ("Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF Dkt. #1.  Petitioner seeks relief for alleged constitutional violations that occurred as a result of his Richland County, Ohio Court of Common Pleas conviction for Conspiracy to Commit Aggravated Murder in violation of Ohio Revised Code (O.R.C.) §2923.01, two counts of Assault in violation of Ohio Revised Code (O.R.C.) §2903.13,  four counts of Kidnapping in violation of Ohio Revised Code (O.R.C.) §2905.01, and four counts of Aggravated Robbery in violation of Ohio Revised Code (O.R.C.) §2911.01, with attached firearms specifications.  On May 24, 2010, Respondent Robert Welch ("Respondent") filed an answer.  ECF Dkt. #7. On June 4, 2010, Respondent filed a supplement to his answer.  ECF Dkt. #8.  On October 8, 2010, Petitioner filed a traverse.  ECF Dkt. #13.

The case was referred to the undersigned for a Report and Recommendation.  For the following reasons, the undersigned RECOMMENDS that the Court DISMISS the petition in its entirety with prejudice:

## I.  SYNOPSIS OF THE FACTS

The Fifth District Court of Appeals of Ohio set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 119 S.Ct. 2403 (1999).  As set forth by the Ohio Court of Appeals, the facts adduced at trial are as follows:

{¶ 2} In December of 2006, Kyle Rinehart was working as a bouncer at a bar and strip club in Shelby, Ohio known as the Triple Diamond/Girls Next Door. Appellant Tywan Osborne managed the club, along with Brandon Griffith. Kyle Rinehart's girlfriend, Ashley Pfeifer, also worked at the club as a DJ. Brittini Hart worked at the club as a bartender.

{¶ 3} On the evening of December 23, 2006, Rinehart's friend Derek White came to the club to see about getting a job as a bouncer. After the club closed in the early morning hours of December 24, 2006, Rinehart and White stayed with Ashley Pfeifer and Brittini Hart to socialize with Appellant and Griffith. Two dancers, Amy Reynolds and Shanna Clay, also stayed after closing.

{¶ 4} At some point, Griffith became very upset, and punched Derek White multiple times in the face. When Kyle Rinehart attempted to intervene, Appellant allegedly pulled out a gun and told him to sit down and stay out of the dispute. After Rinehart refused, Rinehart alleges Appellant hit him in the face.

{¶ 5} Rinehart testified at trial Appellant pointed a 9mm pistol at the victims, demanding they hand over all of their money. He then instructed one of the girls to go upstairs to get another handgun, and a Tech-9 machine gun. The guns were then brandished by Appellant and Shanna Clay.

{¶ 6} Both Rinehart and White testified Appellant and Griffith continued to beat them over a substantial period of time, punching, kicking, whipping with a belt and hitting them with a chain. Both Rinehart and White were forced to strip naked, and had buckets of ice water poured over them and a large commercial fan turned on them. As a result of the incident, Rinehart suffered a broken jaw and White suffered a broken nose. Both suffered multiple contusions and their heads were swollen to the point of non-recognition.

{¶ 7} At some point during the incident, Rinehart testified Appellant pointed a 9mm pistol at the victims, demanding they hand over all of their money. Rinehart testified he gave Appellant $300.00, and White gave him approximately $800.00. Hart and Pfeifer each testified they gave him the money they earned as amateur dancers at the club that night.

{¶ 8} In the early morning hours of December 24, 2006, Appellant telephoned Robert

-2-

"Ed" Perry. Following the telephone conversation, Appellant left the club and drove to Perry's house. He then followed Perry back to the club, communicating with him via cell phone. Appellant told Perry to make the problem disappear. Perry asked Appellant to blindfold the victims, so they could not identify him. Perry took the victims out of the club, but later removed the blindfolds, recognizing Rinehart as his son's good friend. Perry took the four victims to his house, cleaned them up, and took them home.

ECF Dkt. #7-1, Ex. 12; *State v. White*, No. 07-CA-38, 2008 WL 763485 at ¶¶2-8, (Ohio App. 5th Dist. 2008), unreported.

## II.    PROCEDURAL HISTORY

### A.    State Trial Court

On May 10, 2006, the Richland County, Ohio prosecuting attorney filed an indictment charging Petitioner with twenty-one counts, including:(Count 1) Conspiracy to Commit Murder in violation of O.R.C. 2923.11, with a firearms specification, a violation of O.R.C. § 2941.145 (Counts 2 and 3) two counts of Felonious Assault in violation of O.R.C. 2903.11, with firearms specifications, (Counts 4 and 5) two counts of Felonious Assault in violation of O.R.C. § 2903.11, (Counts 6 through 13) eight counts of Kidnapping in violation of O.R.C. § 2905.01, with firearms specifications, (Counts 14 through 17) four counts of Aggravated Robbery in violation of O.R.C. § 2911.01, with firearms specifications, and (Counts 18 through 21) four counts of Attempted Murder, in violation of O.R.C. §2923.02.  ECF Dkt. #7-1, Ex. 1.

On April 23, 2007, Petitioner waived a jury and the case proceeded to a bench trial.  ECF Dkt. #7-1, Ex. 3.  On May11, 2007, the trial judge found Petitioner guilty of conspiracy to commit murder in Count 1, without the firearm specification, as well as the lesser included offense of assault in Counts 2 and 3, without the firearm specifications, four counts of kidnapping in Counts 6 through 9, with the firearms specifications, and four counts of aggravated robbery in Counts 14 through 17, with the firearms specifications. The judge sentenced Petitioner to an aggregate term of 21 years of imprisonment, which included five years for conspiracy to commit murder; six months for each of the assault convictions to be served concurrently, and concurrent with the conspiracy to commit murder conviction, five years on each of the four counts of kidnapping, to be served concurrently, but consecutive to the conspiracy to commit murder conviction; five years on each of the four aggravated robbery charges, to be served concurrent, but consecutive to the kidnapping and

-3-

conspiracy to commit murder charges; three years for the gun specifications relating to the kidnapping counts to be served concurrent to each other, but consecutive to the other sentences.  On the gun specification on the aggravated robbery charges, Appellant was sentenced to three years on the four counts, to run concurrently, but consecutive to the gun specification on the kidnapping and the other convictions.  ECF Dkt. #7-1, Ex. 4.  On May 21, 2007, the trial court issued an Amended Judgment Entry that did not alter Petitioner's convictions or his sentence.  Dkt. #7-1, Ex. 5.  On May 18, 2007, Petition filed a pro se motion for new trial or directed verdict.  Dkt. #7-1, Ex. 8.  The state filed an opposition brief on May 25, 2007.  Dkt. #7-1, Ex. 8.  The trial court overruled the motion in a judgment entry filed on June 6, 2007. Dkt. #7-1, Ex. 9.

### B.    Direct Appeal

On May 21, 2007, Petitioner filed a notice of appeal to the Ohio Court of Appeals for the Fifth District.  ECF Dkt. #7, Ex.1.  Petitioner filed a brief in support of his direct appeal, raising the following assignments of error:

> I.    THE TRIAL COURT ERRED TO DEFENDANTS [SIC] PREJUDICE IN FAILING TO PROVIDE A JURY TRIAL
>
> II.   THE VERDICT OF CONSPIRACY TO COMMIT MURDER WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE
>
> III.  THE COURT ERRED TO DEFENDANTS [SIC] PREJUDICE BY SENTENCING DEFENDANT/APPELLANT TO MORE THAN ONE GUN SPECIFICATION
>
> IV.   THE COURT ERRED TO DEFENDANTS [SIC] PREJUDICE BY SENTENCING DEFENDANT/APPELLANT TO SEPARATE SENTENCES FOR KIDNAPPING AND ROBBERY
>
> V.    TRIAL COUNSEL WAS INEFFECTIVE IN VIOLATION OF THE SIXTH AMENDMENT FOR FAILURE TO OBJECT TO THE TRIAL COURT'S SENTENCING ON THE ALLIED OFFENSES OF SIMILAR IMPORT AND CONSECUTIVE SENTENCES FOR THE GUN SPECIFICATIONS
>
> VI. DEFENDANT/APPELLANT'S CONVICTION OF ROBBERY WAS AGAINST THE WEIGHT OF THE EVIDENCE.

ECF Dkt. #7, Ex. 1.

On March 20, 2008, the Ohio Court of Appeals affirmed Petitioner's conviction but his sentence was vacated in part and remanded for the purposes of resentencing. ECF Dkt. #7-1, Ex. 13. On appeal, the state conceded Petitioner's third assignment of error relating to the multiple sentences

for the gun specifications.  Id.  at ¶18.

### C.      Resentencing

On May 27, 2008, the trial court resentenced Petitioner to an aggregate term of eighteen years, that is, the original sentences for all convictions, with a single firearms specification relating to Counts 6 through 9, and Counts 14 through 17.  ECF Dkt. #7-1, Ex. 18.

### D.      Supreme Court of Ohio

On May 5, 2008, Petitioner filed a pro se notice of appeal to the Supreme Court of Ohio from the  March 20, 2008  judgment of the Ohio Court of Appeals.  ECF Dkt. #7-1, Ex. 14.  On August 9, 2007, Petitioner filed a brief in support of jurisdiction, raising the following propositions of law:

| | |
|---|---|
| Proposition of Law No. 1: | DEFENDANT-APPELLANT WAS DEPRIVED OF DUE PROCESS WHERE THE APPEALS COURT ABUSED ITS DISCRETION IN DETERMINING WHEATHER [SIC] APPEALLLANT [SIC] SENTENCE FOR CONSPIRACY TO COMMIT MURDER WAS NOT SUPPORTED BY THE EVIDENCE, AND A MISCARRIAGE OF JUSTICE HAS OCCURRED WHERE THE APPEALS COURT, SUPPORTED THAT THE FINDER OF FACT DID NOT LOSE HIS WAY IN DETERMINING THE EVIDENCE IN VIOLATION OF THE 5TH AND 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION |
| Proposition of Law No. 2: | DEFENDANT-APPELLANT WAS DENIED DUE PROCESS WHERE THE APPEAL'S [SIC] COURT ABUSED IT'S [SIC] DISCRETION IN DETERMINING WHEATHER [SIC] APPELLANT"S SENTENCE FOR KIDNAPPING, WAS SUPPORTED BY THE EVIDENCE AND A MISCARRIAGE OF JUSTICE HAS OCCURED [SIC] WHERE THE APPEALS COURT, SUPPORTED THAT THE FINDER DID NOT LOSE HIS WAY IN DETERMINING THE EVIDENCE, IN VIOLATION OF THE 5TH AND 14TH AMENDMENT"S TO THE CONSTITUTION |
| Proposition of Law No. 3: | DEFENDANT-APPELLANT WAS SENTENCED AND CONVOCTED [SIC] IN VIOLATION OF THE ALLIED OFFENSE DOCTRINE FOR THE OFFENSE'S OF KIDNAPPING AND ROBBERY IN VIOLATION OF DUE PROCESS. MAKING THE SENTENCE'S VOID AS A MATTER OF LAW IN VIOLATION OF THE 5TH AND 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION |
| Proposition of Law No. 4: | DEFENDANT-APPELLANT WAS DENIED |

-5-

EFFECTIVE ASSISTANCE OF TRIAL COUNSEL. WHERE HE FAILED TO OBJECT TO DEFENDANT, BEING SENTENCED TO GUN SPECIFICATION'S [SIC] IN VIOLATION OF IT'S [SIC] 6TH AMENDMENT GUARANTEE OF EFFECTIVE COUNSEL

Proposition of Law No. 5:   DEFENDANT-APPELLANT WAS DEPRIVED OF DUE PROCESS. WHERE THE APPEAL'S COURT ABUSED IT'S DISCRETION IN DETERMINING WHETHER APPELLANT SENTENCE FOR ROBBERY WAS NOT SUPPORTED BY THE EVIDENCE AND A MISCARRIAGE OF JUSTICE HAS OCCURED [SIC] WHERE THE FINDER OF FACT DID NOT LOSE HIS WAY IN DETERMINING THE EVIDENCE IN VIOLATION OF APPELLANT'S 5TH AND 14TH AMENDMENT RIGHT TO DUE PROCESS.

ECF Dkt. #7-1, Ex. 15.  On November 21, 2007, the Supreme Court of Ohio dismissed the appeal as not involving a substantial constitutional question.  ECF Dkt. #7-1, Ex. 17.

**E.  Post-conviction Petition**

On January 29, 2008, prior to filing the direct appeal in the Supreme Court of Ohio, Petitioner filed a post-conviction petition in the Cuyahoga County, Ohio Court of Common Pleas. ECF Dkt. 7-1, Ex. 19.  Petitioner raised the following claims for relief:

I.     INEFFECTIVE ASSISTANCE OF COUNSEL: MY LAWYER MR. HOMER DIDN'T EVEN PREPARE FOR MY CASE I ONLY HAD 2 10 MINUTES [SIC] VISITS FROM HIM. HE WAS EVEN TOLD TO SIT DOWN IN OPEN [SIC] ARGUMENTS.  HE FAILED TO ACT COMPETENT A LAWYER SHALL NOT HANDLE A LEGAL MATTER WITHOUT PREPARATION ADEQUATE IN THE CIRCUMSTANCES. MR. HOMER FREE HANDED MY TRIAL, NOT TAKING THE TIME TO READ THE DISCOVERY NOR DID HE QUESTION ANY WITNESSES ABOUT THEIR STATEMENTS BECAUSE HE NEVER READ THEM HE JUST DIDN'T CARE.  HE EVEN TOLD ME BEFORE I WAS FOUND GUILTY THAT I WAS GOING TO GET FOUND GUILTY

II.    I WAS DENIED MY RIGHTS TO HAVE A PUBLIC TRIAL.  THE AMENDMENT OF THE US [SIC] CONSTITUTION INCLUDES SUCH RIGHTS AS RIGHT TO A SPEEDY AND PUBLIC TRIAL BY AN IMPARTIAL JURY, RIGHT TO CONFRONT WITNESSES, THE RIGHT TO ASSISTANCE OF COUNSEL AND COMPULSORY PROCESS. MY FAMILY WAS IN THE COURT FOR THE TESTIMONY OF MR. REINHART AFTER THAT THE COURT TOOK A RECESS WHEN IT WAS TIME FOR MY TRIAL TO BEGIN MY FAMILY WASN'T ALLOWED BACK IN THE COURT ROOM, THEREFORE DENYING MY RIGHT TO A PUBLIC TRIAL.

III.   WITNESS COMMITTED PERJURY AT MY TRIAL AND ADMITTED TO

-6-

IT AT BRANDON GRIFFITH TRIAL (DOCUMENTS ATTACHED) ABOUT SMOKING MARIJUANA ON THE NIGHT OF THE INCIDENT, WHICH WOULD BE THE FOUNDATION OF MY CASE BECAUSE ON INCIDENT WITNESSES WHO COMMITED [SIC] PERJURY IS MR. REINHART AND MS. BRITTNEY HEART, THESE FACTS SHOULD BE TAKEN INTO CONSIDERATION BECAUSE IT MIGHT OF CHANGED THE OUTCOME OF MY TRIAL

IV.    PROSECUTOR MISCONDUCT/MISREPRESENTATION OF EVIDENCE

*Id*. On March 24, 2008, the Cuyahoga County Court of Common Pleas denied Petitioner's post-conviction petition. ECF Dkt. #7-1, Ex. 20. Petitioner did not appeal the judgment of the trial court.

### F.    28 U.S.C. § 2254 Petition

On December 14, 2009, Petitioner filed the instant petition for a writ of habeas corpus. ECF Dkt. #1. Petitioner has raised the following grounds for relief:

GROUND ONE:     Defendant [sic] conviction is not supported by sufficient evidence

GROUND TWO:     Ineffective assistance of counsel

ECF Dkt. #1. On May 24, 2010, Respondent filed a return of writ. ECF Dkt. #7. On June 4, 2010, Respondent filed a supplement to the return of writ. ECF Dkt. #8. On October 8, 2010, with leave of court, Petitioner filed a traverse. ECF Dkt. #13.

## III.    PROCEDURAL BARRIERS TO REVIEW

        A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus. As Justice O'Connor noted in *Daniels v. United States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." 532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).

### A.    <u>Statute of Limitations</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final. 28 U.S.C. § 2244(d)(1). The AEDPA statute of limitations is not at issue in this case.

### B.    <u>Procedural Default</u>

-7-

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman,* 501 U.S. at 730.  For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed).  When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition.  *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991).  In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there is no independent and adequate state grounds for a state court decision absent a clear statement to the contrary.  *Coleman*, 501 U.S. at 735.

Applying this presumption, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted.  *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  Under the *Maupin* test, a reviewing court must decide:

    (1)    whether the petitioner failed to comply with an applicable state procedural rule;

    (2)    whether the state courts actually enforced the state procedural sanction;

    (3)    whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and

    (4)    if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (state procedural bar that is not "firmly established and regularly followed" cannot serve to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006).  The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005).

-8-

Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (appeal dismissed for lack of jurisdiction); *Richey*, 395 F.3d at 678 ("a lapsed claim survives if the state court overlooked the default and decided the claim anyway"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000) (even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises); *Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000) (where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply).

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision. *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004).

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 490 U.S. 1068 (1985). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527 (1986).

Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004).  The above standards apply to the Court's review of Petitioner's claims.

IV.  **STANDARD OF REVIEW**

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 on December 14, 2009, well after the act's effective date of April 26, 1996. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998). Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus. The AEDPA provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Furthermore, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court

-10-

decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A. Decisions of lower federal courts may not be considered.

B. Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C. The state court decision may be overturned only if:

1. It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

2. the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

3. 'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

4. the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D. Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable. That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' 'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E. Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

-11-

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986).  The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

> (e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e).  The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact.  *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied,* 509 U.S. 907 (1993).  The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility."  *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997).  Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000).  Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## V.     ANALYSIS

### A.      Ground One: Insufficiency of the Evidence

The allegation that a verdict was entered upon insufficient evidence states a claim under the due process clause of the Fourteenth Amendment to the United States Constitution.  *Jackson v. Virginia*, 443 U.S. 307, *reh'g denied*, 444 U.S. 890 (1979), *and In re Winship*, 397 U.S. 358 (1970). To determine whether the state court unreasonably applied the sufficiency-of-the-evidence standard of *Jackson v. Virginia*, * * * "[f]irst, we must ask whether the evidence itself was sufficient to convict.... [and] [t]he inquiry ends if the panel determines that there was sufficient evidence."  *Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir.2010) (citation omitted).  Second, "[i]f we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether

-12-

the state court was 'objectively unreasonable' in concluding that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt." Id. (citation omitted). The result of this double deference is that "habeas corpus relief is appropriate based on insufficient evidence only where we find, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir.2007).  On habeas review, federal courts must assume that the jury "resolve[d] conflicts in the testimony," "weigh[ed] the evidence," and drew "reasonable inferences" therefrom. *Jackson*, supra, at 319.  A court should interfere with a jury verdict only to the extent necessary to guarantee the fundamental protections of due process of law.

Petitioner challenges the sufficiency of the evidence underlying each and every one of his convictions for conspiracy to commit murder, kidnapping, and aggravated burglary.  With respect to his conviction for conspiracy to commit murder, the court of appeals wrote:

> {¶ 23} Appellant was charged with conspiracy to commit murder, in violation of R.C. 2923.01(A)(1):
>
> {¶ 24} "(A) No person, with purpose to commit or to promote or facilitate the commission of aggravated murder, murder, kidnapping, compelling prostitution, promoting prostitution, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, engaging in a pattern of corrupt activity, corrupting another with drugs, a felony drug trafficking, manufacturing, processing, or possession offense, theft of drugs, or illegal processing of drug documents, the commission of a felony offense of unauthorized use of a vehicle, illegally transmitting multiple commercial electronic mail messages or unauthorized access of a computer in violation of section 2923.421 of the Revised Code, or the commission of a violation of any provision of Chapter 3734. of the Revised Code, other than section 3734.18 of the Revised Code, that relates to hazardous wastes, shall do either of the following:
>
> {¶ 25} "(1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;"
>
> {¶ 26} Appellant argues a reasonable mind could conclude he knew of Ed Perry's relationship with Kyle Rinehart and the other victims and he could trust Perry to keep them from going to the authorities, which is why he called him. Appellant further cites Brittany Hart's testimony Appellant told them if they didn't go back to work he would kill them and their families. Appellant asserts he called Perry to keep the victims from contacting the police, as an alternative to killing them. Accordingly, Appellant asserts, there is no evidence of a conspiracy to commit murder.

-13-

{¶ 27} Upon review of the record, Robert "Ed" Perry testified at trial he knew Appellant and Griffith for about six months, because he bought crack cocaine from them. He testified he knew Kyle Rinehart, because he and his son were good friends. Perry testified he heard Appellant talking about shooting and killing people, "gang stuff," prior to December 24, 2006. He responded to Appellant, "Man, we don't talk about that stuff around here, we just do it."

{¶ 28} Perry testified at trial concerning the incident at issue:

{¶ 29} "A. Tywan called and woke me up, I don't know, 3:00 or 4:00 in the morning, 5:00 in the morning. I'm not even real sure what time. I didn't look at the clock.

{¶ 30} "Q. Did you recognize the voice as that of Tywan Osborne?

{¶ 31} "A. Oh, yes.

{¶ 32} "Q. What did he say to you?

{¶ 33} "A. He just said he needed me to come to the club. Something about a couple guys messed him over and he wanted some help or something. He wouldn't give me no details. I said, Well, come pick me up, I don't think I got a ride. So he started on his way and I called him back. I got my ride. He was already pulling in the driveway. He said, Well, I'll just follow you. I followed him into the club.

{¶ 34} "Q. Up to that point, did he tell you what he needed you for or what was going on?

{¶ 35} "A. I had no idea what was going on.

{¶ 36} "Q. Did you talk to him anymore on the way there?

{¶ 37} "A. Yeah. We got on the cell phone. The only thing I really remember him saying is, Don't be shocked by what you're going to see. I said, What am I walking into here? He said, A couple guys tied up. I said, Tied up? I said, Man, I don't want these people to know who I am. So I guess at that point he called his buddy and told him to blindfold them.

{¶ 38} "Q. So you could go in and not be seen.

{¶ 39} "A. Yeah. See what's going on.

{¶ 40} "Q. Did you-at that point did you still have any idea what was expected of you?

-14-

{¶ 41} "A. No. No, sir.

{¶ 42} "Q. All right. What happened when you got there and parked your cars?

{¶ 43} "A. Well, we walked in, and when I walked in, I looked across the room and I could see Derek and Kyle. They were tied up, blindfolded, and bloody from head to toe, naked. The scene like I have never, ever could imagine in my life. It was just unimaginable.

{¶ 44} "Q. What was unimaginable?

{¶ 45} "A. Derek, I just-I've known this kid since he was seven, ten years old, or whatever.

{¶ 46} "Q. Derek or Kyle?

{¶ 47} "A. Kyle. I just spoke to him maybe six, eight hours before this. And I didn't recognize him. His head was as big as a basketball. I had no idea who these people were, but I was going to get them out of there. That's all-that's all I knew. I didn't know who they was at that point in time.

{¶ 48} "Q. Just two naked boys tied up and beaten up and blindfolded.

{¶ 49} "A. Yes, sir.

{¶ 50} "Q. Now, what, if anything, did you decide to do when you walked in and saw that?

{¶ 51} "A. I was going to get them out of there, whoever they was.

{¶ 52} "Q. Did you form any kind of plan on how you were going to get them out there?

{¶ 53} "A. I just started talking shit.

{¶ 54} "Q. What do you mean by that?

{¶ 55} "A. Well, when we first got there, he started-you know, we was standing, like, when you first walk in there. He said, Man, the only way to take care of it, to clean

-15-

this up is to take these guys out. That's when I was, like, Oh, you talking about killing these people? That's when I started talking crazy, Let me take care of this, let me do this, I'll take care of this.

{¶ 56} "Q. So were you offering-

{¶ 57} "A. Get these guys out of here.

{¶ 58} "Q. Were you offering to take them out and kill them?

{¶ 59} "A. I wasn't seriously taking them out and killing them. I wanted to get them out of there.

{¶ 60} "Q. What was their reaction for you to do that?

{¶ 61} "A. For somebody to do their dirty work, it wasn't hard to convince them. I was straight and sober as can be. They was buzzing. It wasn't hard to convince them.

{¶ 62} "Q. How was Brandon Griffith acting?

{¶ 63} "A. Brandon was really wild. He was-he was really out of control.

{¶ 64} "Q. What was he doing?

{¶ 65} "A. Running around beating on them, you know, just acting crazy, just completely out of hand. Tywan was more together.

{¶ 66} "Q. I was going to say, how was Tywan acting?

{¶ 67} "A. He was more together.

{¶ 68} "Q. Okay. What was he saying or doing?

{¶ 69} "A. He just wanted the problem to go away. He knew he took it too far.

{¶ 70} "Q. Did there come a point in time when Tywan Osborne either agreed or rejected the idea of taking them out and killing them and getting rid of them?

{¶ 71} "A. He was all for that. Whatever it took so he wouldn't get in no trouble.

{¶ 72} "Q. What did you do then?

{¶ 73} "A. Just started talking, you know, like hey, you know, I'll take care of this, let me handle this. I used to hunt around here, you know, I know places we could bury these kids and nobody would ever see them again, you'll never hear about them again, stuff like that. Just talking, anything I could say to get them kids in my hands.

{¶ 74} "Q. What, if anything, did you do when Brandon was still beating on them?

{¶ 75} "A. Well, I jumped between them and acted like I-you know, I grabbed Derek when he was beating Derek with the chain. I got in between them and grabbed Derek by the shirt and said, Hey punk, you know what you're going to get, you're going to get more of this, you know, just to stop the beating.

{¶ 76} "Q. So you're acting like you're going to-

{¶ 77} "A. Yeah. I'm acting like I'm with these guys. But the kids knew better.

{¶ 78} "Q. What happened then?

{¶ 79} "A. We just-I was just there a matter of minutes. I wasn't there over ten minutes probably. They agreed to let me have them kids. As soon as I got out the door, Come on, get in the fucking car, let's go, let's get out of here. I took them straight to my house, cleaned them up, gave them all the money I had.

{¶ 80} "Q. Slow down. You're getting way ahead of me. How did you get them out the door?

{¶ 81} "A. I convinced these guys to let me have them and got them out.

{¶ 82} "Q. Did you see any guns?

{¶ 83} "A. Oh, heck yeah. There was guns and blood everywhere.

{¶ 84} "Q. Let's talk about the guns. Was anybody what you would consider to be under the point of a gun or at gunpoint?

{¶ 85} "A. Well, at that time there was some girl, I'm not sure of the girl, I never met this girl. But she was standing at the end of the stage with a gun pointed at Derek and the girl, Derek and Kyle. It seemed like the girls had a gun on them, too, back over by the VIP room.

{¶ 86} "Q. Gun on them as in holding a gun or gun on them as in pointed at them?

{¶ 87} "A. Gun pointed at them.

{¶ 88} "Q. Okay. And as you went out the door, were they under gunpoint?

{¶ 89} "A. Yeah. Yes, they was.

{¶ 90} "Q. All right. When you-

{¶ 91} "A. That's when that big Tec 9 was-I believe was being held.

{¶ 92} "Q. Do you recall which one of them was holding that big Tec 9?

{¶ 93} "A. I believe it was Tywan.

{¶ 94} "Q. Okay. What did you do when you got them out to the car?

{¶ 95} "A. I said, Come on, let's go, let's go, let's go, get in here. You know, they didn't try to run or escape or anything between the building and the car. I guess because they knew there was a gun on them, maybe, and they knew they was with me too. Because during the parking lot I was tapping them, elbowing them, Come on, get in the car, get out of here, you know. I got them in the car and we went straight to my house.

{¶ 96} "Q. What did you do when you got them to your house?

{¶ 97} "A. Cleaned them up, bandaged them up. Like I said, I give them everything I could give them. Then I went back to the club and tried to retrieve their goods. I can't remember exactly what I retrieved. I retrieved a few items and brought it to them.

{¶ 98} "Q. How long after you-did you ever hear from Tywan Osborne or Brandon Griffith after you left there?

{¶ 99} "A. Yeah. I heard from Tywan. He called and asked if I had taken care of it. I said, Don't worry about it. I said, You'll never hear from the kids, they'll never say nothing. That first phone call I don't think he knew exactly what I'd done. He probably assumed I probably took them out. I don't know.

{¶ 100} "Q. Okay. But you were vague with him about what you'd done or hadn't done?

-18-

{¶ 101} "A. I wasn't very specific with him.

{¶ 102} "Q. Okay. So in other words, you didn't tell him I killed them and you didn't tell him I didn't kill them.

{¶ 103} "A. Nope. I didn't tell him either way at first.

{¶ 104} "Q. All right. And did you have any other conversations with him?

{¶ 105} "A. Yeah. After that, you know-

{¶ 106} "Q. Back up. I'm sorry. When you had that first conversation with him, don't worry, I took care of it, you'll never hear from him again, et cetera, what was his reaction?

{¶ 107} "A. Are you sure, you know? You're positive of this? Yeah. You'll not hear from them.

{¶ 108} "Q. Okay.

{¶ 109} "A. Then the next day I called-he called and, you know, I told him, you know, I didn't do nothing to them, they're fine, you know, they'll be all right, but they're not going to talk, they're not going to go to the police, and so forth.

{¶ 110} "Q. How did you explain that they're not going to go to the police?

{¶ 111} "A. I just told him to trust me.

{¶ 112} "Q. Did you hear any more from him after that?

{¶ 113} "A. I kept in contact with him trying to figure out what to do about all this, you know. Because I knew something had to be done, you know, one way or another.

{¶ 114} "Q. What other kind of contact did you have with him?

{¶ 115} "A. Well, he come around saying that this had to be cleaned up. There was only one way to do it, we gotta take these people out. He was wanting these people killed. And that wasn't going to happen.

-19-

{¶ 116} "Q. Well, how did you handle that?

{¶ 117} "A. I didn't. I just blew it off.

{¶ 118} "Q. Okay. I mean, did you say, No, we don't need to kill them, or did you say, Okay, I'll kill them?

{¶ 119} "A. Oh, no, I didn't say I'd kill them. No, we don't need to kill them. They're not going to say nothing, don't worry about it. That's all I kept saying to him.

{¶ 120} "Q. Was he ever satisfied with that?

{¶ 121} "A. He seemed to be. He got to where he was satisfied finally with that. He let it be.

{¶ 122} "Q. All right. When you left the bar that night, what was your understanding as to what you were supposed to do with these four kids?

{¶ 123} "A. According to them, they thought I was going to kill them, I guess.

{¶ 124} "Q. Okay."

{¶ 125} Tr. at 490-498

{¶ 126} Kyle Rinehart also testified at trial:

{¶ 127} "Q. Okay. If you can describe what the events were surrounding getting blindfolded, who was doing what, what was happening?

{¶ 128} "A. Before we got blindfolded Tywan made a phone call and said that we was going to be getting taken care of.

{¶ 129} "Q. How did you take that?

{¶ 130} "A. Like I thought I was going to die."

{¶ 131} Tr. at 51

{¶ 132} Derek White also testified concerning the circumstances relative to Mr. Perry:

-20-

{¶ 133} "A. Just started-they were flipping out trying to get somebody to take us or somebody to kill us. They were talking about killing us.

{¶ 134} "Q. Who is they?

{¶ 135} "A. Tywan and Brandon.

{¶ 136} "Q. Do you know what transpired, what happened?

{¶ 137} "A. They blindfolded us once and told us they were going to take us out in the car, put us in the trunk.

{¶ 138} "Q. Who is telling you that?

{¶ 139} "A. Tywan. At that time I was blindfolded. I'm pretty sure it was Tywan. They were discussing it, him and Brandon.

{¶ 140} "Q. Okay. Now, again, pursuant to those comments and those discussions, what, if anything, happened?

{¶ 141} "A. I don't know. At that time I was scared. I don't know.

{¶ 142} "Q. Well, I guess really that's just my fancy way of saying what happened next?

{¶ 143} "A. Well, they unblindfolded us, again, and just kept taunting us and stuff.

{¶ 144} "Q. Okay. Keep going, tell me what happened next?

{¶ 145} "A. Then they blindfolded us, again. Then they had somebody on the phone. I didn't know who it was at the time.

{¶ 146} "Q. Now, let me ask you a question. What did they blindfold you with?

{¶ 147} "A. Them white shirts.

{¶ 148} "Q. Those bloody white T-shirts?

{¶ 149} "A. Yes, sir.

-21-

{¶ 150} "Q. Who is they, when you say they got somebody on the phone?

{¶ 151} "A. Tywan is the one that had the phone. So Tywan got Ed on the phone.

{¶ 152} "Q. Okay. Did you know it was Ed at the time?

{¶ 153} "A. No, sir.

{¶ 154} "Q. Okay. What happened then?

{¶ 155} "A. Then just he blindfolded us, again. Right before Ed got there and then Ed come in they took our blindfold off. Let us put our clothes back on and stuff and on the way to the back, they put us in this little room back there. They were discussing something with Ed and that's when Brandon come in and hit me in the back with the chain an wrapped it around my neck on the way out of the room and from there Tywan come over and stopped Brandon from beating me with the chain and stuff and pushed me out the door with that machine gun. Then from there we got in Ed's car and went to his house.

{¶ 156} "Q. Did you know Ed?

{¶ 157} "A. No, not that well at the time.

{¶ 158} "Q. Did you, what were you thinking Ed was going to do?

{¶ 159} "A. Well, when I first went out to the car Kyle got right in. I was like, "We've got to get out of here. They are going to kill us. They are going to kill us." Kyle is like, "It is all right. It is Isaac Perry's dad." And I knew Isaac.

{¶ 160} "Q. That left you to know-

{¶ 161} "A. I knew I was all right then. So I got in the car."

{¶ 162} Tr. at 211-214

{¶ 163} In light of the testimony cited above, there was competent, credible evidence to support Appellant's conviction for conspiracy to commit murder.

Petitioner contends that the trial judge should have inferred from the foregoing testimony that he knew that Perry was acquainted with Rinehart, and that he chose Perry to deal with the situation

-22-

based upon that relationship.   In other words, Petitioner enlisted Perry to convince Rinehart and White not to report the incident to the police.  The stronger inference, of course, was the inference actually drawn by the trial judge.  First, although Petitioner claims that Perry's relationship with Rinehart was one of the reasons that Rinehart was employed at the club, Perry denied that he asked Petitioner to employ Rinehart.  (Tr., p. 501.)  According to Perry's testimony, it was his son who approached Petitioner about giving Rinehart a job. (Tr., p. 500.)  Furthermore, the fact that Petitioner blindfolded Rinehart and White is contrary to the inference that he was relying upon the relationship between Perry and Kyle to diffuse the situation.  Most importantly, Perry testified that Petitioner stated, "the only way to take care of it, to clean this up is to take these guys out."  Id. at ¶55.

"Courts must draw a difficult line between inference and speculation, and when a state court draws a reasonable one, the reviewing court defer to its judgment."  *White v. Steele*  602 F.3d 707, 711 (6th Cir.2009).  Based upon the evidence, the trial judge drew a reasonable inference when he concluded that Petitioner conspired to murder Rinehart and White, and there was sufficient evidence to convict the Petitioner on the first count of the indictment.

With respect to his conviction for kidnapping, the court of appeals wrote:

{¶ 166} Appellant was charged with kidnapping, in violation of R.C. 2905.01, which reads:

{¶ 167} "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

{¶ 168} "(1) To hold for ransom, or as a shield or hostage;

{¶ 169} "(2) To facilitate the commission of any felony or flight thereafter;

{¶ 170} "(3) To terrorize, or to inflict serious physical harm on the victim or another;"

{¶ 171} Appellant cites the testimony of Ashley Pfeifer and Brittany Hart stating the incident continued for at least an hour before any guns were brought out. Appellant argues his conviction is against the manifest weight and sufficiency of the evidence because the victims were not moved to any other place, and they were clearly only as it was normal for them to stay for hours. Appellant argues Rinehart and White took

-23-

off their clothes without guns being pointed at them. Appellant further asserts the victims did not attempt to leave during the incident before the guns were brandished.

{¶ 172} Upon review of the record, the testimony presented at trial, as noted supra, clearly establishes the victims were restrained of their liberty for several hours due to Appellant's beating them and holding them at gun point, in order to facilitate the commission of the offense of aggravated robbery.

Petitioner appears to argue that the victims in this case were only held at gun point for a brief period of time, and, with the exception of the brief period of time, they were free to leave th club. To the contrary, the testimony offered at trial established that the victims were initially present at the club of their own volition, but that, as soon as the assault began on White, that none of the victims were free to leave the club. While Rinehart and White were being beaten, Pfeifer and Hart were moved to another couch and told to be quiet. Moreover, when arrangements were being made with Perry, the victims were moved into another room. Therefore, Petitioner's argument that the victims were not restrained beyond the brief period that they were held at gunpoint is not supported by the record, and there is sufficient evidence to support the kidnapping convictions in this case.

With respect to his conviction for aggravated robbery, the court of appeals wrote:

Appellant was convicted of aggravated robbery, in violation of R.C. 2911.01(A)(1):

{¶ 201} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

{¶ 202} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;"

{¶ 203} In his argument, Appellant again argues the conduct for which he was convicted of aggravated robbery also constituted the allied offense of kidnapping. Further, Appellant cites the testimony of Ashley Pfeifer stating she did not think Appellant had anything to do with the robbery.

{¶ 204} Upon our review of the record, Kyle Rinehart, Derek White and Brittani Hart all testified Appellant was the individual pointing the gun at them and demanding all of their money during the altercation. Accordingly, there was competent, credible evidence to support Appellant's conviction for aggravated robbery.

-24-

Petitioner relies on Pfeifer's testimony that he was not present when the robbery occurred in order to demonstrate that there was insufficient evidence to convict him of the aggravated robbery charges. Although Pfeifer did not place Petitioner at the scene during the robbery, the remaining three victims testified that Petitioner held them at gunpoint and demanded that they give him their money. "While the [factfinder] may take note of the inconsistencies and resolve or discount them accordingly, see [*State v.*] *DeHass* [(1967), 10 Ohio St.2d 230, 227 N.E.2d 212], such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Nivens* (May 28, 1996), 10th Dist. No. 95APA09-1236. It is within the province of the [factfinder] to make the credibility decisions. See *State v. Lakes* (1964), 120 Ohio App. 213, 217, 201 N.E.2d 809. ("It is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness.") Consequently, there was sufficient evidence in the record to convict Petitioner of four counts of aggravated robbery.

Accordingly, there was sufficient evidence in the record to convict Petitioner of each and every one of the charges for which he was convicted. Therefore, the petition, to the extent that it is predicated on insufficiency of the evidence, lacks merit.

**B.      Ground Two: Ineffective Assistance of Counsel**

In order to prevail on a claim of ineffective assistance of trial counsel, Petitioner bears the burden of showing that counsel's performance fell below an objective standard of reasonableness and counsel's ineffectiveness prejudiced his defense so as to deprive him of his right to a fair trial. *Strickland v. Washington*, 466 U.S. 668 (1984). To warrant reversal of a conviction, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Court scrutiny of defense counsel review must be "highly deferential." *Id*. at 689. Decisions that "might be considered sound trial strategy" do not constitute the ineffective assistance of counsel. *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). Trial counsel's tactical decisions are not completely immune from Sixth Amendment review, but they must be particularly egregious before they will provide a basis for relief.

-25-

*Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984).

Further, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *West v. Seabold,* 73 F.3d 81, 84 (6th Cir. 1996), quoting *Strickland,* 466 U.S. at 691, quoted in *Smith v. Jago*, 888 F.2d 399, 404-05 (6th Cir.1989), *cert. denied*, 495 U.S. 961 (1990). "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir.1992) (en banc), *cert. denied*, 508 U.S. 975 (1993).

Petitioner concedes that the portion of his ineffective assistance of counsel claim predicated upon his right to a jury trial is procedurally defaulted based upon his failure to raise the issue in state court. Consequently, Petitioner relies exclusively upon his trial counsel's failure to object to the consecutive sentences imposed by the trial court for the kidnapping and aggravated robbery charges to establish ineffective assistance of counsel.

R.C. 2941.25, Ohio's multiple-count statute, prohibits the imposition of multiple punishments for the same criminal conduct. The statute provides that:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

The Ohio Supreme Court recently decided *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N,.E.2d 1061, in which it overruled *State v. Rance* (1999), 85 Ohio St.3d 632, 710 N.E.2d 699. In *Johnson*, the Supreme Court overruled *Rance* "to the extent that it call[ed] for a comparison of statutory elements solely in the abstract under R.C. 2941.25. [Now w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." Id. at ¶44.

-26-

In light of the decision in *Johnson*, the law on allied offenses applies as follows:

Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. *State v. Blankenship* (1988), 38 Ohio St.3d 116, 526 N.E.2d 816 (Whiteside, J., concurring) ('It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses can be committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses.' [Emphasis sic] ). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' [State v.] Brown, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." *Johnson* at ¶ 47-51.

Applying the abstract comparison analysis of *Rance*, the Ohio Court of Appeals concluded that "the elements do not correspond to such a degree that the commission on one would result in the commission of the other." *Osborn* at ¶188. However, the Ohio Supreme Court made clear in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 198, fn. 29, 473 N.E.2d 264, that "implicit within every robbery (and aggravated robbery) is a kidnapping." The Court had previously observed, "[W]hen a person commits the crime of robbery, he must, by the very nature of the crime, restrain the victim for a sufficient amount of time to complete the robbery." *State v. Logan* (1979), 60 Ohio St.2d 126, 131, 397 N.E.2d 1345.

In *Logan*, the Ohio Supreme Court adopted the following guidelines in establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus:

-27-

"Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there [is] no separate animus * * *; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense[.]" *Id.* at syllabus.  Further, "[w]here the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense[.]" Id.

In this case, the restraint of the victims began long before and continued long after the aggravated robbery was completed.  The ordeal began at approximately 3:00 a.m. when the strip club closed.  Rinehart, White, Pfeifer, Hart, Brandon, and Petitioner were sitting on one of the various couches in the establishment.  Approximately thirty minutes later, Brandon started hitting White in the face with his fists, then Petitioner and Brandon began alternating punches to White's face.  Trial Tr., p. 199, 289.  Pfeifer are Hart were told to move to another couch.  They were crying, but they were told to be quiet.  Trial Tr., p. 290.  When Kyle asked for an explanation for the beating, Petitioner and Brandon told him to sit down.  Trial Tr., p. 201. Kyle persisted, and then they began beating Rinehart.  The assaults continued on for approximately two hours before the guns were drawn.  Trial Tr., p. 292-293.  All four of the victims were robbed at gunpoint.  Trial Tr., p. 210.  Rinehart and White were instructed, at gunpoint, to remove their clothes.  Trial Tr., p. 294.  For approximately twenty minutes, they lay naked on the ground being kicked and having ice water dumped on them. Trial Tr., p. 365.  When Rinehart and White became soaked from the ice water, an industrial fan was turned on them.  Trial Tr., p. 210.  Then, all four of the victims were taken to another room, where they remained while Petitioner contacted Perry.  At this point, White was beaten with a chain.  Trial Tr., p. 213.  Based upon the foregoing facts, there is no question that the prolonged restraint subjected the victims to "substantial increase in risk of harm separate and apart from that involved in the underlying crime."  Id.  Both before and after the aggravated robbery, Rinehart and White were beaten and threatened.  Then, all four of the victims are taken to the VIP room, while Petitioner contacted Perry.  Accordingly, the petition, to the extent that it is predicated upon the consecutive sentences for the kidnapping and aggravated robbery charges, lacks merit.

-28-

**VI.    CONCLUSION**

For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition in its entirety with prejudice.

DATE: May 26, 2011                              *s/ George J. Limbert*
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).